BARNES, Presiding Judge.
These companion appeals arise from a medical malpractice action brought on behalf of Gwendolyn Lynette Brown, which alleged that she suffered catastrophic brain damage from oxygen deprivation while undergoing a procedure to relieve back pain. Mrs. Brown died while this suit was pending, and her complaint was amended to add a wrongful death claim by her surviving spouse, Sterling Brown, Sr., who was also added as the administrator of her estate (hereinafter collectively “Brown” unless otherwise noted). The defendants included Dennis Doherty, D.O., Southeastern Pain Specialists, PC. (“the PC.”), Southeastern Pain Ambulatory Surgery Center, LLC (“the Surgery Center”), Ann Yearian, R.N., and Mary Hardwick, R.N.[1]
The trial was trifurcated into a liability phase, a punitive liability phase, and a punitive damages phase. In phase 1 of the trial, the jury found the defendants liable for Brown’s injury and apportioned fault at 50 percent to Doherty, 30 percent to the Surgery Center, 20 percent to the PC., and zero percent to Hardwick. In phases 2 and 3 of the trial, the jury found Doherty liable for punitive damages, but awarded nothing for punitive damages. A final judgment totaling $21,981,093.29 in damages was awarded to Mr. Brown as the surviving spouse and to Mrs. Brown’s estate.
In Case No. A16A0763, Doherty contends that the trial court erred in charging the jury on ordinary negligence, in denying his motion for directed verdict on any claims for ordinary negligence or for conduct occurring after 5:40 p.m., in excluding expert testimony, and in failing to declare a mistrial based on improper character *568 evidence. In Case No. A16A0764, Brown appeals and contends that the trial court erred during the liability phase of the trial in failing to admit certain evidence about Doherty’s conduct, and in failing to declare a mistrial when Doherty placed evidence of his financial condition and liability insurance before the jury.
In Case No. A16A0765, the Surgery Center appeals and contends that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict (JNOV) because there was no evidence that any agent of the Surgery Center breached any duty causing an injury to Mrs. Brown. And, in Case No. A16A0766, the P.C. contends that the trial court erred in not granting a JNOV based on the jury’s apportionment of damages against it, and in not granting a directed verdict or JNOV based on Brown’s failure to establish that the defendants committed any wrongful acts that proximately caused Mrs. Brown’s death.

Facts

Doherty, a board-certified anesthesiologist and pain management specialist, began treating Mrs. Brown in 2008 for chronic back pain. Doherty performed two epidural steroid injection procedures (“ESI”) on Mrs. Brown in the fall of 2008 without incident. During an ESI, steroid medication is injected into the epidural space in the spine to reduce inflammation and relieve pain. The procedures were performed at the Surgery Center, which Doherty had opened in 2006, and where Hardwick was the administrator and nursing director.
On September 16, 2008, Mrs. Brown arrived at the Surgery Center with her daughter-in-law for a 10:00 a.m. appointment for a third bilateral ESI to be performed under conscious sedation. At approximately 2:45 p.m. Hardwick performed Mrs. Brown’s patient pre-op, which included taking her medical history, recording her vital signs, and starting an intravenous line. Afterward, Mrs. Brown napped while she waited to be taken to the operating room for the procedure.
At approximately 4:40 p.m., Yearian, the operating room nurse, took Mrs. Brown to the operating room, at which time Yearian gave her “two milligrams of Versed IV push and 50 mies of Fentanyl.” Fentanyl is a pain reliever, and Versed is a relaxant. Mrs. Brown was also given oxygen at a flow of three to five liters through a nasal cannula. Mrs. Brown’s oxygen level at this point was at 100 percent. Michelle Perkins, the surgical tech, and Yearian placed Mrs. Brown in a prone position on the surgical table, and because Doherty was running late, Perkins had to leave the room three times to tell *569 Doherty that Mrs. Brown was ready for the procedure.[2] Doherty came into the operating room approximately 50 minutes after Mrs. Brown was brought in, and after administering propofol, a short-acting medication that decreases consciousness and memory, he started the procedure at 5:30 p.m. Shortly thereafter, Mrs. Brown’s oxygen level began to drop “rapidly”
The pulse oximeter that was used to monitor Mrs. Brown’s blood oxygen saturation level sounded an alarm, indicating a drop in the level of oxygen in her blood. Perkins testified that the alarm goes off if the oxygen level drops below 90 percent, and Yearian testified that she is generally alarmed when the oxygen level drops below “94 or 92.” Doherty responded to the oxygen saturation decline by instructing Yearian to increase the oxygen flow to five liters, and by physically assessing Mrs. Brown’s breathing and oxygenation level, after which he concluded that she was still breathing. However, Perkins remained concerned, and believed that Mrs. Brown was not breathing and asked Doherty several times if she could turn the oxygen level up higher, but he instructed her to “get back over to the C-Arm.”[3] Perkins asked Doherty if she should call Hardwick, but he responded “no,” because “the patient was breathing and the airway was good.” Still concerned about Mrs. Brown’s breathing and feeling “helpless,” Perkins surreptitiously sent a text to Hardwick, saying simply, “Come.” Perkins testified that she kept her cell phone in her pocket while she sent the text so that Doherty could not see her text Hardwick.
When Hardwick arrived, Mrs. Brown was lying face down on the table with injection needles placed in her back, Doherty was standing at the head of the table holding her jaw to maintain an airway, and the pulse oximeter was registering zero while its alarm sounded. In her incident report, Perkins wrote that when Hardwick walked in “you could see from the way [Yearian] and Dr. Doherty were holding [Mrs. Brown’s] airway and looking at the 02 stat [that] there was a problem.”
Hardwick grabbed a stretcher so that Mrs. Brown could be turned on her back to be resuscitated, but Doherty told Hardwick that the pulse oximeter was malfunctioning, that Mrs. Brown had a pulse, and that she was breathing. Hardwick testified that she observed *570 Mrs. Brown’s back “rising and falling in what appeared] to be a normal rhythm.”
Doherty told Hardwick that the “pulse oximeter is not indicative of what her true oxygen saturation is,” so Perkins retrieved a second pulse oximeter and Hardwick placed it on Mrs. Brown’s toe, but its alarm also sounded, and both monitors had a reading of zero oxygen saturation. During this time, the blood pressure monitor was also recycling, which indicated that it was not detecting a blood pressure. Doherty maintained that everything was “fine” and continued to demonstrate to Yearian how to “hold the airway.”
Yearian took over for Doherty to maintain Mrs. Brown’s airway while Doherty finished the procedure. Hardwick and another staffer who was called in to assist held up Mrs. Brown’s shoulders to “help take some weight off her chest to maybe get her better oxygenated without getting in . . . Doherty’s way ... so he could finish the procedure.” After Doherty completed the procedure, and the needles were removed, Doherty maintained the airway while the others turned Mrs. Brown over and Doherty administered Narcan and Romazicon, sedation-reversal drugs. Mrs. Brown’s oxygen flow level was also increased to 15 liters. The procedure was completed at 5:48 p.m.
The “first stats” recorded after the procedure reflected an oxygen level registering “in the 50s . . . and [Doherty] started bag-masking” her. After a few minutes of ventilating Mrs. Brown with the airbag, her oxygen levels rose to the 90s. Hardwick asked if she could call 911, but Doherty replied “no,” that Mrs. Brown was just heavily sedated.
Mrs. Brown’s daughter-in-law testified that she was brought to the recovery room and Doherty instructed her to talk to Mrs. Brown and “keep trying to stimulate her,” but the daughter-in-law testified that Mrs. Brown “would just open her eyes like she was trying to talk and she was spitting.” Doherty reassured the daughter-in-law that “these things happen with anesthesia.” Eventually, when Mrs. Brown did not fully wake up or respond normally to “voice or painful stimuli” after almost three hours, 911 was called at approximately 7:30 p.m. The daughter-in-law testified that Doherty told the responding emergency medical technicians that Mrs. Brown “was there that day for an epidural procedure, the procedure went fine and she was having complications coming out of the anesthesia slowly” He did not mention any other complications and did not tell the technicians that Mrs. Brown had possibly experienced a hypoxic event.
The treating neurologist at the hospital testified that, according to the medical history provided when Mrs. Brown was brought in, she had undergone an epidural procedure and “in the recovery room . . . they saw her clenching her mouth and getting stiff and... jerking her *571 legs, so they thought she was having a seizure and that’s what prompted them to . . . call the EMS.” The neurologist testified that Mrs. Brown’s behavior was more in line with someone who had an hypoxic or anoxic injury, so he asked that someone call the Surgery Center to find out what happened. He was told that “there was no history of hypoxia because she had a pulse ox and everything was fine.” It was later determined that Mrs. Brown had suffered a catastrophic brain injury caused by oxygen deprivation. As a result of her injury, she was profoundly cognitively impaired and a quadriplegic until her death six years later, on September 16, 2014.

Case No. A16A0763

1. Doherty first contends that the trial court committed reversible error by charging the jury on ordinary negligence. He asserts that the charge was inapplicable because all of Brown’s theories of liability against Doherty were based on professional malpractice and violations of the physician standard of care. We do not agree.
Because
complaints against professionals may state claims based on ordinary as well as professional negligence, the complaint’s characterization of claims as stating professional or ordinary negligence does not control. Where the professional’s alleged negligence requires the exercise of professional skill and judgment to comply with a standard of conduct within the professional’s area of expertise, the action states professional negligence. But where the allegations of negligence do not involve professional skill and judgment, the action states ordinary negligence. Whether a complaint alleges ordinary or professional negligence [or both] is a question of law for the court.
(Citations omitted; emphasis supplied.) Bardo v. Liss, 273 Ga. App. 103, 104 (1) (614 SE2d 101) (2005). See Candler Gen. Hosp. v. McNorrill, 182 Ga.App. 107, 110 (2) (354 SE2d 872) (1987) (“notevery suit which calls into question the conduct of one who happens to be a medical professional is a ‘medical malpractice’ action”). A jury charge is authorized if there is some evidence from which jurors can conduct a legitimate process of reasoning with respect to the charge. T.G.&Y. Stores Co. v. Waters, 175 Ga.App. 884, 886 (2) (334 SE2d 910) (1985). Further, “[a] jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law.” (Citation and punctuation *572 omitted.) Ware v. Henry County Water & Sewerage Auth., 258 Ga. App. 778, 784 (7) (575 SE2d 654) (2002).
Here, the jury could, without the help of expert testimony, find that certain acts and omissions associated with Mrs. Brown’s injury were claims of ordinary rather than professional negligence. A layperson would not need an expert to convey the implication of two pulse oximeters with readings of zero percent oxygen, or of a blood pressure monitor that continually recycles without registering a blood pressure. A layperson would also understand, without the guidance of expert testimony, that the emergency technicians and medical staff at the hospital where Mrs. Brown was taken by ambulance should have been fully and truthfully informed about the incident in the operating room that indicated a hypoxic event.
In Dent v. Mem. Hosp. of Adel, 270 Ga. 316, 318 (509 SE2d 908) (1998), the trial court’s decision to charge only professional malpractice was erroneous. We held that the jury could have been misled to believe that it could not return a verdict based upon ordinary negligence even though the plaintiff’s claims about the nurses’ incorrect operation of an apnea monitor, their failure to follow the doctor’s orders, and their failure to ensure that the “crash cart” was equipped for pediatric patients were claims of ordinary, not professional, negligence.
Likewise, in Carter v. Cornwell, 338 Ga. App. 662 (791 SE2d 447) (2016), in reversing the dismissal of Carter’s claim for failing to attach an expert affidavit, this Court held that the medical practice’s on-call doctor “was not utilizing professional judgment or medical expertise” when the doctor provided Walgreens with inaccurate information about a prescription, which resulted in Carter’s arrest for altering a prescription. Id. at 666. We further held that the claim
for failing to properly handle on-call responsibilities because the physician on call did not make an effort to call [Carter’s doctor] after he or she was contacted by Walgreens or have any procedure to verify the prescription . . . did not require the exercise of professional judgment or skill.
Id.
Similarly, here a jury could find, without the help of expert testimony, that certain acts and omissions associated with Mrs. Brown’s injury — including failing to fully and accurately disclose the incident to the hospital and ignoring the implications of two alarming oximeters and a recycling blood pressure monitor— sounded in ordinary rather than professional malpractice. See Kneip v. Southern Engineering Co., 260 Ga. 409, 410 (3) (395 SE2d 809) (1990) (“[T]here *573 are instances in which actions performed by or under the supervision of a professional are nevertheless not professional acts constituting professional malpractice, but, rather, are acts of simple negligence which would not require proof by expert evidence.”); Liu v. Boyd, 294 Ga. App. 224, 226 (1) (668 SE2d 843) (2008) (“Whether a complaint alleges ordinary negligence or professional malpractice is a question of law for the court, regardless of how the plaintiff categorizes it.”) (citation and punctuation omitted); Brown v. Durden, 195 Ga. App. 340, 340-342 (393 SE2d 450) (1990) (physical precedent only) (jury could determine without the help of expert evidence whether the “medical assistant exercised due care in leaving decedent unattended and unrestrained on the examining table after he had been brought to the office suffering from dizziness and nausea following an apparent seizure”).
Accordingly, the trial court did not err in charging the jury on ordinary negligence.
2. Doherty also contends that the trial court erred in denying a directed verdict on the ordinary negligence claims, based on the “same reasons the trial court erred in charging the jury on ordinary negligence.” “The standard of appellate review of a trial court’s denial of a motion for a directed verdict ... is the ‘any evidence’ test.” (Citation omitted.) Galardi v. Steele-Inman, 266 Ga. App. 515, 516 (1) (597 SE2d 571) (2004). “Although the evidence in the case was in some instances conflicting, it certainly met the criteria of the ‘any evidence’ rule.” Kelly Ford, Inc. v. Paracsi, 141 Ga. App. 626, 627 (1) (234 SE2d 170) (1977). As explained in Division 1, because there was some evidence from which the jury could have found ordinary negligence in Doherty’s actions, the trial court did not err in denying his motion for directed verdict on this basis.[4]
3. Doherty also contends that the trial court erred in failing to grant a directed verdict on all claims based upon events that occurred after 5:40 p.m. He contends that there was no evidence that any standard of care violations that happened after 5:40, including the 911 call at 7:30 p.m. and Mrs. Brown’s transfer to the hospital, caused any harm to Mrs. Brown. We do not agree.
*574 As previously noted, there was some evidence that Mrs. Brown experienced oxygen deprivation from about 5:30 p.m. to 5:48 p.m. Doherty’s argument appears to be premised on the assumption that the injury was complete at 5:40 p.m., at which point Mrs. Brown had been deprived of oxygen for ten minutes and had already suffered brain damage. Brown’s neurology expert testified that, depending on the degree of hypoxia, “permanent brain injury can occur as early as three, four, or five minutes . . . and of course it gets worse the longer the time goes by and the more severe the hypoxia is.” Brown’s expert anesthesiologist testified that “once five minutes [have] gone by, the thought is that there has been some neurologic damage. It may get worse and worse as time goes by”
Thus, the evidence presented did not demand a finding that no act occurred after 5:40 p.m. that contributed to Mrs. Brown’s injury, and the trial court did not err in denying Doherty’s motion for directed verdict to that effect.
4. We also find no merit to Doherty’s contention that the trial court erred in excluding the testimony of one of his experts.
The record demonstrates that on February 8, 2012, the trial court issued an amended case management order. After noting that “all parties [had] identified expert witnesses, except [Doherty],” the trial court directed Doherty to identify his expert witnesses, if any, no later than February 29, 2012. The order stated that “ftjhere shall be no extensions of these deadlines by agreement of the parties,” that motions filed after the deadlines would be untimely and “may not be considered,” and that “failure to comply with the deadlines set forth in this . . . Order may result in the imposition of sanctions, including striking pleadings, assessments of attorney’s fees, exclusion of evidence or witnesses, or other sanction.” (Emphasis supplied.)
The trial was specially set for November 18, 2013, and on August 2, 2013, Doherty identified Dan Martin, M.D. to testify “that nothing Dr. Doherty did or failed to do caused Mrs. Brown’s injuries.” On November 5, 2013, Brown filed a motion to “exclude [Doherty’s] untimely designated testifying expert,” asserting that Martin was “untimely designated” and also that his testimony that Mrs. Brown’s injury was caused by a stroke was scientifically unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).[5] The case was not tried that month, but subsequently, on March 1, 2014, the trial court entered an order resetting the trial for March 10, 2014, and on March 8, 2014, the trial *575 court entered an order granting Brown’s motion to exclude the testimony of Martin. In excluding the testimony, the trial court found that
the deadline to disclose expert witnesses in this case was February 8, 2012 — over 1½ years prior to the designation of Dr. Martin as an expert in this case. Moreover, at the time Dr. Martin was disclosed as an expert, this case had already been set for trial in November of 2013, a mere three months prior to his designation. Prior to his designation, defendants did not seek leave of court for the late disclosure of an expert. Furthermore, in their response to the motion, defendants offer absolutely no reason for the late disclosure, leaving this Court with no explanation for why they waited until the eve of trial to disclose the expert witness. Finally, this Court notes that the Case Management Order filed in this case clearly states that the failure to comply with any deadline therein may result in a number of sanctions, including exclusion of witnesses.
“Trial courts have broad discretionary powers under the discovery provisions of the Civil Practice Act and appellate courts have consistently refused to interfere with the exercise of a trial court’s discretion except in cases of clear abuse.” (Citation omitted.) Opatut v. Guest Pond Club, 188 Ga. App. 478, 482 (9) (373 SE2d 372) (1988). It is true that we have generally held that the “ [e] xclusion of probative trial evidence is not an appropriate remedy for curing an alleged discovery omission.” Hunter v. Nissan Motor Co., 229 Ga. App. 729 (1) (494 SE2d 751) (1997). See Thakkar v. St. Ives Country Club, 250 Ga. App. 893 (1) (a) (553 SE2d 181) (2001). See also Hart v. Northside Hosp., 291 Ga. App. 208 (661 SE2d 576) (2008) (trial court abused discretion by granting motion in limine to exclude plaintiff’s expert medical affidavit in light of discovery violation). But this Court has also explicitly upheld the authority of the trial court to exclude expert testimony as a sanction for a discovery violation under some circumstances. See Jones v. Livingston, 203 Ga. App. 99, 102-103 (4) (416 SE2d 142) (1992) (trial court did not abuse its discretion by refusing to allow expert to testify on a subject not timely revealed to plaintiffs). In distinguishing the cases in which exclusion was improper, this Court
emphasize[d] that [these are not cases] where a party violated a court order explicitly directing the party to identify an expert witness for trial, nor did the order at issue warn parties of potential sanctions for failure to meet deadlines, such as the exclusion of evidence or the dismissal of the action.
*576 Hart, 291 Ga. App. at 210 (1), n. 9. Further, we specifically held that these cases do not “limit a trial court’s authority to issue such orders.” Id.
In the present case, all parties agreed that there would be no extensions of the deadlines provided for in the case management order, and that the violations of the deadlines could result in the exclusion of evidence or witnesses. Doherty submitted Martin’s name as an expert witness approximately 18 months after the deadline agreed to in the case management order. “Because the plain terms of the trial court’s order barred the [extension of deadlines for producing witnesses], the trial court did not err when it granted the defendants’ motions to exclude [Martin’s testimony] Collins v. Dickman, 295 Ga. App. 601, 603-604 (1) (672 SE2d 433) (2008).
The imposition of scheduling deadlines for the identification of experts, and questions regarding the admission or exclusion of expert testimony, are left to the broad discretion of the trial court. And we have held that a trial court may exercise its discretion and exclude testimony from an expert not properly identified by a party, when done in violation of an express court order.
(Footnote omitted.) Moore v. Cottrell, Inc., 334 Ga. App. 791, 794 (2) (780 SE2d 442) (2015). Doherty’s expert was not properly identified in violation of an express court order. Accordingly, the trial court did not abuse its discretion in excluding the testimony of Martin.
Moreover, other than the conclusory statement that the “trial court’s decision to exclude relevant and probative evidence was prejudicial,” Doherty does not demonstrate how the exclusion of Martin’s testimony prejudiced his defense. In his deposition, Martin essentially testified that Doherty did not violate the standard of care in maintaining Mrs. Brown’s airway and also that Mrs. Brown’s injury was caused by a stroke, rather than hypoxia. This testimony was merely cumulative of other testimony presented at the trial by another defense expert, Dr. Richard Moon, who also testified that Mrs. Brown’s cause of injury was a stroke rather than hypoxia.
5. The trial court did not err in failing to grant a mistrial based on comments made by Brown’s trial counsel that Doherty alleges were in violation of the trial court’s rulings in limine.
Under OCGA § 9-10-185, where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also *577 rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion the court may order a mistrial for improper remarks of counsel.
Sangster v. Dujinski, 264 Ga. App. 213, 216 (590 SE2d 202) (2003). SeeOCGA § 9-10-185.[6] “In reviewing the trial court’s refusal to grant a mistrial, we consider whether the remarks affected or infected the verdict, and whether it is apparent that a mistrial is essential to the preservation of the right to a fair trial.” (Citations and punctuation omitted.) Id. at 217.
We first note that Doherty complains about several improper comments, but includes no attendant citation to the eleven-volume trial transcript. As previously noted in this opinion and repeatedly stated by this Court in the past, “[t]he burden is on the party alleging error to show it affirmatively by the record.” (Punctuation and footnote omitted.) Steele v. Atlanta Maternal-Fetal Medicine, 283 Ga. App. 274, 277-278 (3) (641 SE2d 257) (2007). And per
[o]ur Rule 25 (c) (2) (i) . . . each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of such reference, the court will not search for or consider such enumeration.
(Punctuation omitted.) City of Albany v. Pait, 335 Ga. App. 215, 221 (5) (780 SE2d 103) (2015).
The one complained-about comment that we were able to locate in the voluminous record occurred during Brown’s cross-examination of Moon:
[BROWN’S ATTORNEY]: If a doctor intentionally misled Saint Joseph’s Hospital, you would consider that act to be criminal behavior, wouldn’t you?
[MOON]: Well criminal, I would no. I mean ....
[TRIAL COURT]: Just a minute. Just a minute.
*578 Brown withdrew the question, and Doherty said, “[W]e have a motion.” The trial court replied that it would “take that up in a minute,” and the Surgery Center requested that it be allowed a “couple of quick questions” for the witness. Afterward, when the witness was excused and the jury released for lunch, the following exchange occurred:
[TRIAL COURT]: I’m sure there was going to be a motion. [Brown’s attorney], ... do you want this case to come back? Because I’m getting real close. You’re pushing the envelope and you have been. . . . I’ve given ruling after ruling about what is appropriate and what is not. That question crossed the line.
[BROWN’S ATTORNEY]: I really don’t your honor. Let me tell you why. What happened in this case was criminal. We’ve always contended that it was criminal. It was intentional misconduct, and that’s what happened in this case.... [N]ot just during the procedure, but after the procedure when he gave false statements to the other doctors.
[TRIAL COURT]: And that is not the issue in this first part of the trial. I don’t know how many more times I have to say that. But I will say, you violate that again, and I will strongly, strongly consider a motion for a new —
[DOHERTY’S ATTORNEY]: mistrial.
[TRIAL COURT]: Thank you.
Despite the trial court’s admonition to Brown’s trial counsel after the witness was excused, defense counsel made no formal objection, no motion for mistrial, and no request for curative instructions. Under these circumstances, this enumeration of error presents nothing for review. The trial court did not err by failing to grant sua sponte a mistrial that was not requested. Upon hearing the prejudicial question, the trial court interrupted the cross-examination and the question was withdrawn, in accordance with OCGA § 9-10-185. “[T]o preserve a point of error for the consideration of an appellate court, counsel must take exception to the alleged error at the earliest possible opportun ity in the progress of the case by a proper objection made a part of the record.” (Emphasis supplied.) Sharpe v. Dept. of Transp., 267 Ga. 267 (1) (476 SE2d 722) (1996), rev’d on other grounds, 270 Ga. 101 (505 SE2d 473) (1998).

Case No. A16A0764

6. Brown contends that the trial court erred in excluding evidence of Doherty’s “patient safety issues” that were relevant to prove *579 the knowledge that triggered the duties owed by Hardwick, the Surgery Center and the P.C., to prove the medical standard of care applicable to Hardwick, and to refute the defense that neither Hardwick, the Surgery Center, nor the P.C. had any reason to distrust Doherty’s judgment. Brown argues, among other things, that evidence of Doherty’s past behavior affecting patient safety was relevant to prove that the other defendants had a duty to intervene based on their knowledge of that behavior.
Hardwick, Doherty, the PC., and the Surgery Center filed numerous motions in limine seeking to exclude evidence concerning Doherty’s conduct preceding the incident at issue, including any alleged impairment, and to exclude evidence of any corresponding duties related to their knowledge of that conduct. In its order denying the motions, the trial court noted that the trial was scheduled to begin on March 10, 2014, that argument on the motions in limine was heard on that day, and that the court had ruled that the “testimony and evidence [about Doherty’s alleged impairment and the defendants’ duty related to the impairment] would not be admissible.”
The trial court further noted that on the second day of the trial, before opening arguments, Doherty informed trial counsel that he would not be able to appear because of a medical issue, and that “[u]pon further inquiry by the Court, it became apparent that Defendant Doherty had on-going mental and physical issues that impacted his ability to testify and appear at trial.” The trial court held that upon reconsideration of the motions in limine that dealt with “evidence and testimony relating to . . . Doherty’s physical and mental condition,” the motions were denied because “Doherty, through his own conduct, injected his mental and medical condition into the case.” The trial court then held that Brown could introduce evidence and testimony regarding Doherty’s medical condition, including the side effects of cancer treatment, such as dry mouth, speech impairment, fatigue, drowsiness, and inattentiveness. The trial court dismissed the jury and granted a mistrial.
On December 15, 2014, upon consideration of the defendants’ renewed motions in limine to exclude the impairment evidence, the trial court entered an order granting the motions in part and trifur-cating the trial.[7] In excluding what it found to be inadmissible *580 character evidence under OCGA § 24-4-404, the trial court held that, while Doherty had injected his medical condition and prior acts into the March trial,
[a]t this point, this action is set on a new trial calendar with a completely different jury pool, in a proceeding that is, essentially, de novo. As a result, . . . Doherty has not, at this time, placed his medical condition directly in issue in this trial and before this jury.[8] Therefore, this Court finds that OCGA § 24-4-404 (a) (1) does not necessarily apply at this time.[9]
(Emphasis in original.)
The trial court held that, although Brown presented a compelling argument, the court did not agree with Brown’s contention that evidence of Doherty’s medical condition and alleged impairment was admissible because the evidence was necessary to demonstrate the duty owed by the defendants to Brown through the admission of testimony regarding the other defendants’ knowledge about Doherty’s prior illness, fatigue, and other issues. The court concluded that
Doherty’s medical history, or whether or not... Doherty was impaired on prior occasions is not essential to demonstrating that, on this occasion, Defendants committed negligence by violating the standard of care. The relevant issues are what was ... Doherty’s conduct in this instance and whether or not the Defendants’ medical care of [Mrs. Brown] violated the standard of care. . . . [T]he evidence regarding . . . Doherty’s prior behavior and impairment do not fit within any of the exceptions for character evidence in regard to proving the medical malpractice or wrongful death claims asserted herein.
*581 The trial court then held that
to the extent that [Brown] comes forward with evidence to establish that, on and during his treatment of .. . [Mrs. Brown], . . . Doherty exhibited the behaviors at issue (irritability, tardiness, fatigue, etc.), that evidence would be relevant to the question of what was ... Doherty’s conduct in this instance
and therefore admissible. The trial court also found that if Doherty were found liable during the first phase of the trial, then during the punitive phase, in addition to opinion testimony about Doherty’s state of mind or mental condition, Brown could introduce evidence of “Doherty’s [past] medical conditions, including the side-effects from his cancer treatment and radiation, including dry mouth, speech impairment, fatigue, drowsiness, irritability, tardiness, and inattentiveness.” We find no error.
The admission or exclusion of evidence is reviewed by an abuse of discretion standard. Questions of relevance are generally matters within the trial court’s discretion, and it is not error to exclude evidence that is not related to an issue at trial. Further, a judge may exercise discretion in excluding even otherwise relevant evidence if he finds that its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or of misleading the jury.
(Citations and punctuation omitted.) American Assn. of Cab Companies v. Olukoya, 233 Ga. App. 731, 733 (1) (505 SE2d 761) (1998).
OCGA § 51-12-33 (c) requires the trier of fact in cases to which the statute applies to consider the fault of all persons or entities who contributed to the alleged injury or damages, meaning all persons or entities who have breached a legal duty in tort that is owed with respect to the plaintiff, the breach of which is a proximate cause of the injury sustained by the plaintiff.
(Punctuation omitted.) Zaldivar v. Prickett, 297 Ga. 589, 600 (1) (774 SE2d 688) (2015). Brown contends that the evidence of Doherty’s past conduct was relevant to establish the defendants’ legal duty to Brown based on their knowledge about Doherty’s prior conduct that might *582 have affected patient safety.
The general character of parties and especially their conduct in other transactions are irrelevant matters. A party’s conduct on the occasion at issue in the case may be proved only by the facts of that event and not by evidence of the party’s prior acts or general character for carelessness or recklessness. Such evidence is not probative of the issue at hand and may prejudice the jury against that party as to the question of liability in the particular case. One party is not permitted to influence the jury to find against the other party on account of some act which he may have committed on another occasion, in a different situation and with other parties.
(Citations and punctuation omitted.) Taylor v. Racetrac Petroleum, 238 Ga. App. 761, 762 (1) (519 SE2d 282) (1999) (decided under former OCGA § 24-2-2). See OCGA § 24-4-403 (“Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”).
The balancing test under . . . OCGA § 24-4-403 is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such factbound assessments. . . . Only rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a [trial] court’s on-the-spot judgment concerning the relative weighing of probative value and unfair effect.
(Footnote omitted.) Rivers v. K-Mart Corp., 329 Ga. App. 495, 497 (1) (765 SE2d 671) (2014) (in bifurcated trial, trial court accounted for risk of improper influence on jury by excluding evidence of criminal record during liability phase).
Whether or not Doherty exhibited questionable conduct on prior occasions, as alleged, is not essential to demonstrating that defendants deviated from the standard of care regarding Mrs. Brown’s care if their knowledge was not related to Doherty’s acts or omissions on the day of the incident. This would not be so if the evidence demonstrated that on the day of the procedure, Hardwick or others noticed that Doherty was exhibiting the complained-about behavior. In that instance, their knowledge of Doherty’s past conduct would be relevant to the defendants’ violation of the standard of care, in that it *583 would impact the degree to which they should defer to Doherty’s care of Mrs. Brown. As the trial court found, and we agree, despite the numerous depositions and testimony, no one “on that day discussed [Doherty’s] possible impairment or odd behavior.” (Emphasis supplied.) See Webster v. Boyett, 269 Ga. 191 (496 SE2d 459) (1998) (trial court did not abuse its discretion in excluding evidence of prior DUI offense from liability phase of negligence action involving DUI).
Here,
[t]he issues involved were complex and required the trial court ... to consider and synthesize a great deal of factual information, argument, and law, which that court was uniquely positioned to do. We give trial courts wide latitude to determine whether to admit or exclude evidence because the answers are not always clear-cut and the trial court is in the best position to make that determination. In making this ruling here, we do not find the trial court abused its discretion.
(Punctuation omitted.) Sellers v. Burrowes, 302 Ga. App. 667, 672 (2) (691 SE2d 607) (2010). See Williams v. Booker, 310 Ga. App. 209, 212 (1) (b) (712 SE2d 617) (2011) (“Absent a factual basis linking Williams’ alcohol addiction or use to the claimed act of medical malpractice, the evidence is inadmissible because it is both irrelevant and highly prejudicial.”); Hanie v. Barnett, 213 Ga. App. 158, 160 (1) (444 SE2d 336) (1994) (“In view of the great possibility that evidence concerning the other issues might taint the trial of the professional negligence case,” trial court did not abuse discretion in omitting evidence of prior conduct during liability phase of trial.).
7. Brown also contends that the trial court erred by not declaring a mistrial after Doherty placed evidence of his financial condition and liability insurance before the jury. We do not agree.
The grant of a mistrial is within the discretion of the trial court, and a mistrial is required “only where the testimony is so obviously prejudicial in its nature that its adverse effect cannot be eradicated from the minds of the jury or its consequences avoided by proper cautionary instructions from the court.” (Punctuation omitted.) Dubose v. Ross, 222 Ga. App. 99, 100 (473 SE2d 179) (1996).
During phase 3 of the trial to determine punitive damages, the following exchange took place during direct examination of Doherty:
[DOHERTY’S ATTORNEY]: Now, you understand the jury’s already awarded a judgment of over $22 million; and 11 million of that will be — plus you will have to pay You understand that?
*584 [BROWN’S ATTORNEY]: Objection.
DOHERTY: Yes.
[TRIAL COURT]: Yeah. That’s an inappropriate question.
[DOHERTY’S ATTORNEY]: No, your honor. I think financial wherewithal, I can go into that and the insurance in the case. I intend to go into what his financial condition is, which is allowed.
[BROWN’S ATTORNEY]: Objection.
The jury was excused, and during the ensuing bench conference, the trial court instructed Doherty’s attorney that his line of questioning was improper and that evidence of liability insurance was inadmissible. Doherty’s attorney responded that he believed that the “financial condition he’s in, how he has and what he has available to pay, the resources [are] obviously admissible.” The trial court responded that, in response to defense counsel’s question, it was going to give Brown “an enormous amount of leeway in responding to what’s available, who settled what, who tried to settle.” Brown renewed his objection and moved for a mistrial but advised the trial court, “[Y]ou don’t have to grant it. But for me to preserve it though, I have to ask for a mistrial.” The trial court denied the motion, and Brown responded, “Thank you.” The trial court informed the attorneys that it would give the jury a curative instruction, but did not know that any useful instruction existed. Brown replied that he did not think a curative instruction would help but rather would “ring the bell even louder.”
While
evidence of the limit of insurance liability coverage should be kept from a jury since it might prejudice the jurors against a defendant and improperly motivate them to recklessly award damages to claimants, . . . harmful error does not necessarily result in every instance where an improper question goes unanswered.
(Citations and punctuation omitted.) Ashley v. Goss Bros. Trucking, 269 Ga. 449, 450-451 (499 SE2d 638) (1998). See Goins v. Glisson, 163 Ga. App. 290, 292 (1) (292 SE2d 917) (1982) (“generally liability or no-fault insurance coverage of a litigant is not admissible in evidence, and . . . unnecessary disclosure of such fact is ground for mistrial or reversal”).[10] Here, although Doherty’s attorney argued that he was *585 allowed to inject evidence of insurance into the case, Brown objected to that line of questioning before any insurance evidence was introduced, the trial court sustained the objection, and the jury was excused while the issue was discussed. Brown did not request a curative instruction nor, arguably, a mistrial, given his comment that the trial court did not have to grant his motion. See Watson v. Ga. Federal Bank, 201 Ga. App. 192, 193 (410 SE2d 387) (1991) (unanswered question did not prejudice proceedings even though it may have been a patent attempt to introduce inadmissible evidence).
In view of the peculiar circumstances of this case, including the fact that no insurance evidence was introduced, that the trial court undertook prompt, vigorous, and emphatic action, and that Brown did not request curative instructions or strongly demand a mistrial, the trial court did not abuse its discretion in denying the motion for mistrial. See Ingles Markets v. Kempler, 317 Ga.App. 190, 197 (5) (730 SE2d 444) (2012) (“It is a well-settled appellate rule that one cannot complain about a ruling of the trial court which the party’s own trial tactics or conduct procured or aided in causing.”) (punctuation omitted).

Case No. A16A0765

8. The Surgery Center contends that the trial court erred by denying its motions for directed verdict and JNOV. It maintains that, although the jury found that the Surgery Center was 30 percent liable for Mrs. Brown’s injuries, the evidence cannot sustain the verdict because there was no evidence that Doherty acted as the Surgery Center’s agent, either as an employee or owner. The Surgery Center contends that Brown’s assertion that it employed Doherty is inconsistent with Brown’s pre-trial pleadings, which only alleged that the P.C. employed Doherty, and that no other evidence indicated that the Surgery Center employed Doherty It further asserts that Brown’s theory of agency based on OCGA § 14-11-301 (a), which makes every member of a limited liability company its agent, was not properly raised before the Surgery Center’s motion for JNOV, and thus Brown is precluded from asserting it on appeal.
[A] corporation is held to be vicariously liable for the torts of its agent that are committed in the prosecution of and within the scope of its business. Accordingly, one who is *586 damaged as the result of a tort that is actually committed by a corporate agent may sue either the individual agent, seeking to establish the agent’s personal liability for the damages, or the corporation, seeking to establish its vicarious liability for the torts of its agent, or the injured party can sue both.[11]
Smith v. Hawks, 182 Ga. App. 379, 384-385 (4) (355 SE2d 669) (1987). Agency is not limited to the relationship of employee and owner; instead, “the relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.” OCGA § 10-6-1. To that end, “[t]he fact of agency may be established by proof of circumstances, apparent relations, and the conduct of the parties. Direct evidence of an agency relationship is not required... and even scant factual support may suffice.” (Citations and punctuation omitted.) Nissan Motor Acceptance Corp. v. Stovall Nissan, 224 Ga. App. 295, 298 (1) (480 SE2d 322) (1997). “The burden of proof rests with the party asserting an agency relationship [.] ” Handy v. DeKalb Med. Center, 298 Ga. App. 82, 83 (679 SE2d 107) (2009).
Here, the record demonstrates that there was evidence from which the jury could find that Doherty was an agent acting within the scope of the Surgery Center’s business when Mrs. Brown underwent the ESI procedure. The complaint alleged that the Surgery Center had “received notice of the institution of this action by virtue of service of the original complaint on [Doherty].” When deposed about whether he was employed by the P.C., the Surgery Center, or both, Doherty responded, “Ownership, employment — I don’t know how — it was — the distinction is not — I owned them” and further responded that all of the workers had to be employed by both the P.C. and the Surgery Center “in tandem to meet the State requirements.”
Perkins, the surgical technician who was present during the procedure, testified that she was not employed by the PC., but worked with Doherty at the Surgery Center, and that he was the “Chief Medical Examiner” and owner of the Surgery Center. Perkins agreed that Doherty was the “owner but also an employee of the company” Nurse Hardwick testified that she had helped Doherty *587 open the Surgery Center, that the P.C. was the office part of the Surgery Center, and that under the “legal structure” of the businesses, Doherty was “employed by the P.C.” Hardwick also testified that she had resigned from her position at the Surgery Center because of the way Doherty treated the staff and because he had fired the Surgery Center’s office manager without her consent.
Given these circumstances, there was ample evidence of Doherty’s agency and evidence that he was acting within the scope of his authority sufficient to find the Surgery Center vicariously liable for his acts and omissions. “An agent... is some person authorized to act for another arising when, expressly or impliedly, there has been a delegation with more or less discretionary power to act, to manage an affair, and to render an account.” Headrick v. Fordham, 154 Ga. App. 415, 417 (1) (268 SE2d 753) (1980). The existence of agency and the extent of the agent’s authority are questions of fact for the trier of fact. Wiggins v. Home Owners Warranty Council of Metro. Atlanta, 168 Ga. App. 777 (310 SE2d 554) (1983). See Ins. Indus. Consultants v. Alford, 294 Ga. App. 747 (669 SE2d 724) (2008) (“As long as there is some evidence to support the verdict, the denial of defendant’s motion for directed verdict, new trial and [JNOV] will not be disturbed.”) (punctuation omitted).
Although the Surgery Center also contends that the pre-trial pleadings did not allege that Doherty was acting both individually and under the auspices of the Surgery Center, in the first consolidated pre-trial order, Brown alleged that Doherty “managed the . . . Surgery Center,” and that he and Hardwick had “managerial authority at the Surgery Center.” See Life Care Ambulance v. Hosp. Auth. of Gwinnett County, 202 Ga. App. 864, 865 (415 SE2d 502) (1992) (pre-trial order supersedes the pleadings and controls the subsequent scope and course of the action).
Given these determinations, we need not address whether Brown’s theory of agency based on OCGA § 14-11-301 (a) was not timely raised in the court below, as asserted by the Surgery Center.
9. The Surgery Center also contends that independent of Doherty, who it argues was not its agent, and Hardwick, who was found not liable, no other independent acts or omissions sustained the judgment against it. However, this argument is meritless considering our conclusion in Division 8 that the judgment against the Surgery Center can be sustained based on Doherty’s conduct as its agent. Thus, we need not consider whether any other independent acts or omissions, as asserted by the Surgery Center, were sufficient to sustain the verdict.

*588
Case No. A16A0766

10. The P.C. contends that the trial court erred in denying its motion for directed verdict and JNOV because Brown did not advance any direct claims against the P.C., impliedly arguing that Doherty was not its agent, and thus that the apportioning of damages to the PC. was not proper. It maintains that the only basis for liability was premised on respondeat superior or the agency of Hardwick, who was found to have no liability.
Again, on appeal from the denial of a motion for a directed verdict or for JNOV, the standard of review is whether any evidence supports the jury’s verdict, and the evidence is construed in the light most favorable to the party opposing the motion. Park v. Nichols, 307 Ga. App. 841, 845 (2) (706 SE2d 698) (2011). In denying the PC.’s motion for directed verdict on the ground that there was no testimony directly connecting the PC. to Mrs. Brown’s injury, the trial court found that there was evidence directly connecting the PC. to the injury, and thus its liability for damages was “a question of fact for the jury,” although there were “clearly conflicts as to the issue.” The trial court also found “some testimony” that the actions that caused Mrs. Brown’s injury were “connected within the scope and employment of Southeastern PC.” By its verdict, the jury found that the PC. was liable “based on independent acts and/or omissions” and that Doherty was acting as the PC.’s agent.
Even assuming without deciding that there were no direct claims alleged against the PC., the PC. remains vicariously liable for the negligence of its agents. See Foxchase, LLP v. Cliatt, 254 Ga. App. 239, 241-242 (5) (562 SE2d 221) (2002) (“One damaged by the tort of a corporate agent may sue the individual agent, the corporation or both... and the jury could have found them all liable in their separate capacities for separate acts.”). It is generally true that “where a defendant employer’s liability is entirely dependent on principles of vicarious liability, ... a verdict exonerating the employee also exonerates the employer.” (Punctuation and footnotes omitted.) PN Express, Inc. v. Zegel, 304 Ga. App. 672, 680 (5) (697 SE2d 226) (2010). Here, however, the PC. was not entirely exonerated. While the jury did not find Hardwick liable, the PC. is still liable for the acts and omissions of Doherty, the PC.’s agent.
The existence of agency and the extent of the agent’s authority are questions for the trier of fact. Wiggins, 168 Ga. App. 777. As previously demonstrated, Doherty owned and was listed as the agent of the Surgery Center and the PC., both over which he exerted almost full authority and control. Hardwick testified that the PC. was the office part of the Surgery Center, that she had helped Doherty open *589 the Surgery Center, and that under the “legal structure” of the businesses, Doherty was “employed by the P.C.” When asked about his employment status with the Surgery Center and the P.C., Doherty responded, “[o]wnership, employment — I don’t know how it was — the distinction is not — I owned them,” and further explained that all of the workers had to be employed by both the PC. and the Surgery Center “in tandem to meet the State requirements.”
Because the PC. has failed to show that the evidence demanded a different verdict as to Doherty’s agency status with the PC., the trial court did not err in denying its motions for directed verdict and JNOV. See Sims v. Sims, 265 Ga. 55, 56 (452 SE2d 761) (1995). Thus, its claim that it was improper to apportion a percentage of the damages to the PC. is meritless. See OCGA § 51-12-33 (b) (“Where an action is brought against more than one person for injury to person or property, the trier of fact. .. shall. .. apportion its award of damages among the persons who are liable according to the percentage of fault of each person.”); Zaldivar, 297 Ga. at 600 (1) (the trier of fact should “consider the fault of. . . all persons or entities who have breached a legal duty in tort that is owed with respect to the plaintiff, the breach of which is a proximate cause of the injury sustained by the plaintiff, . . . regardless of whether such tortfeasor would have actual liability in tort to the plaintiff”).
11. We also find no merit to the PC.’s contention that the trial court erred in denying its motion for directed verdict on Brown’s wrongful death claim because Brown failed to prove that any act or omission of any of the defendants proximately caused Mrs. Brown’s death. It contends that none of the expert testimony established a causal link between the PC.’s negligence and Mrs. Brown’s death.
Proximate cause “is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred.” T.J. Morris Co. v. Dykes, 197 Ga. App. 392, 395-396 (4) (398 SE2d 403) (1990) (punctuation omitted). “[I]t is axiomatic that questions regarding proximate cause are undeniably a jury question.” Ontario Sewing Mach. Co. v. Smith, 275 Ga. 683, 687 (2) (572 SE2d 533) (2002) (punctuation omitted). And, in this case,
[wjhether or not [Mrs. Brown’s death] ... was the proximate result of the [PC.’s] negligent deviation from the appropriate standards of care was a medical question beyond the ken of laypersons. In such cases, causation issues can be resolved only by expert medical testimony, standing alone; in which case the testimony sufficient to establish a causal connection *590 must at least show there was a reasonable probability that the negligence caused the injury.
(Citations omitted.) Pilzer v. Jones, 242 Ga. App. 198, 201 (1) (529 SE2d 205) (2000). “Certainty is not required, but the plaintiff must show a probability rather than merely a possibility that the alleged negligence caused the injury or death.” Abdul-Majeed v. Emory Univ. Hosp., 225 Ga. App. 608, 609 (484 SE2d 257) (1997) (emphasis in original), overruled in part on other grounds, Ezor v. Thompson, 241 Ga. App. 275, 279 (526 SE2d 609) (1999).
Here, Brown presented expert testimony that certain acts and omissions fell below the standard of care during Mrs. Brown’s procedure; that as a result she was deprived of adequate oxygen for 18 minutes; that as a result of the oxygen deprivation, she suffered a permanent hypoxic brain injury; that the hypoxic brain injury caused permanent, profound, cognitive impairment and quadriplegia; that until she died Mrs. Brown required 24-hour care and experienced health complications, particularly respiratory complications; and that the compromised respiratory ability resulting from her compromised neurologic status caused her death. The cause of death on Mrs. Brown’s death certificate was identified as “respiratory complications of hypoxic encephalopathy due to complication of sedation.”
Under these circumstances, the trial court did not err in denying the P.C.’s motion for directed verdict on the wrongful death claim.
12. The P.C. also asserts in the argument portion of its brief that a directed verdict on Doherty’s agency was required because the evidence demonstrating that Doherty was the PC.’s agent was not put forth during Brown’s case-in-chief.
However,
[ejven if the trial judge erroneously failed to direct a verdict at the conclusion of the plaintiffs’ evidence[,] if thereafter evidence be admitted without objection, which, when considered with evidence previously admitted, makes out a case in favor of the plaintiffs [,] it would be substituting procedure and form for substance to say that the case ought to be reversed and a new trial granted. To establish such a rule would manifestly be contrary to the intent of the Civil Practice Act and of the Appellate Practice Act[.]
(Citation and punctuation omitted.) John H. Smith, Inc. v. Teveit, 175 Ga. App. 565, 566 (1) (333 SE2d 856) (1985).
Here, there was some evidence in the trial record, taken as a whole, to support a finding that Doherty was the PC.’s agent, as *591 discussed supra in Division 10. Consequently, the P.C. has failed to assert a valid basis for reversal.

Judgment affirmed.

Miller, P. J., Ellington, P. J., McFadden, Rickman andMercier, JJ., concur. Andrews, P. J., Branch andMcMil-lian, JJ., dissent.

 The trial court dismissed Yearian with prejudice before trial. She is not a party to this appeal.

 Perkins testified that Doherty was interviewing another patient for pre-op the first time she went to get him, and could not recall what he was doing the other two times.

 A C-Arm is a medical imaging device used during an ESI to help the doctor position the injection needles in the spine.

 Although we have reviewed this enumeration of error, we note that Doherty incorrectly cites the volume and page number for the location of the motions for directed verdict. The record in this case consists of 41 volumes, and we will not cull the record on a party’s behalf to locate information in support of the party’s argument. Carlisle v. Abend, 288 Ga.App. 150, 151 (1) (653 SE2d 388) (2007). Rather, it is the party’s duty in the first instance to cite to “such parts of the record or transcript essential to a consideration of the errors complained of,” and such “[rjecord and transcript citations shall be to the volume or part of the record or transcript and the page numbers that appear on the appellate record or transcript as sent from the trial court.” (Emphasis supplied.) Court of Appeals Rule 25 (a) (1).

 Brown deposed Martin after receiving notice of the designation.

 Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion, the court may order a mistrial if the plaintiff’s attorney is the offender.
OCGA § 9-10-185.

 In Webster v. Boyett, 269 Ga. 191 (496 SE2d 459) (1998), the Supreme Court held that, as a result of the punitive damage bifurcation procedure codified in OCGA § 51-12-5.1, courts must use their discretion to either bifurcate or trifurcate a trial when punitive damages are at stake. In a bifurcated proceeding, the jury first addresses liability, compensatory damages, and liability for punitive damages. Id. at 193. In the second phase, the jury considers the amount *580 of punitive damages. Id. In a trifurcated proceeding, the jury decides liability and compensatory damages in the first phase, liability for punitive damages in the second phase, and the amount thereof in the third phase.

 The trial court also noted:
The case was originally re-set for trial in September of 2014; however, . . . Brown passed away shortly before that trial was scheduled to start, and this Court reset the case to a one week trial calendar in December. Shortly before the December calendar, this Court became aware that counsel estimated the case would take 2 weeks to try, and the case had to be re-set yet again to January 2015.

 OCGA § 24-4-404 (a) (1) provides, in pertinent part: “Evidence of a person’s character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for . . . [ejvidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same.”

 OCGA § 24-4-411 prohibits the admission of evidence that someone was or was not insured against liability in a civil damages case, unless the evidence is offered for a relevant *585 purpose and the trial court “finds that the danger of unfair prejudice is substantially outweighed by the probative value of the evidence.”

 Every corporation acts through its officers and is responsible for the acts of such officers in the sphere of their appropriate duties; and no corporation shall be relieved of its liability to third persons for the acts of its officers by reason of any bylaws or other limitation upon the power of the officer not known to such third person.
OCGA § 14-4-64.